*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0355P (6th Cir.)
File Name: 02a0355p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

Nos. 00-2070/
2270/2338

YAYA KONE (00-2070);
FERANBA KEITA (00-2270);
NOHA FOFANA (00-2338),
  *Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 99-50086—Paul V. Gadola, District Judge.

Argued: April 25, 2002

Decided and Filed: October 10, 2002

Before: RYAN, BOGGS, and COLE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Daniel G. Van Norman, Lapeer, Michigan, Thomas V. Wilhelm, Waterford, Michigan, N. C. Deday LaRene, LaRENE & KRIGER, Detroit, Michigan, for Appellants. Nancy A. Abraham, ASSISTANT UNITED

1

STATES ATTORNEY, Flint, Michigan, for Appellee.
**ON BRIEF:** Daniel G. Van Norman, Lapeer, Michigan,
Thomas V. Wilhelm, Waterford, Michigan, N. C. Deday
LaRene, LaRENE & KRIGER, Detroit, Michigan, for
Appellants. Nancy A. Abraham, ASSISTANT UNITED
STATES ATTORNEY, Flint, Michigan, for Appellee.

------------------

**OPINION**

------------------

RYAN, Circuit Judge. Yaya Kone and Feranba Keita
appeal their convictions and sentences after a jury found them
guilty of visa fraud by entering into sham marriages and filing
petitions for adjustment in status visas, in violation of
18 U.S.C. § 1546. Noha Fofana appeals his conviction and
sentence after a jury found him guilty of conspiracy to defraud
the United States by arranging sham marriages between
foreign nationals and United States citizens, and submitting
false documents and making false representations to the
Immigration and Naturalization Service (INS), in violation of
18 U.S.C. § 371. For the following reasons, we **AFFIRM** the
defendants' convictions and sentences.

**I.**

**BACKGROUND**

The defendants ran and/or were involved with a sham
marriage scheme designed to evade provisions of the
immigration laws regarding residency and citizenship in the
United States. The leader of the conspiracy, Noha Fofana,
arranged the marriages and his contact, John Oliver,
performed the weddings in Findlay, Ohio.

Fofana would receive between $3,000 and $10,000 from
individual foreign nationals to arrange a marriage to a United
States citizen. Fofana would pay these United States citizens
between $500 and $800 for the wedding and an additional

There was no structural error in this case. We conclude that this case is more akin to *Love*, *Grant*, and *Pfingst* than to *Mortimer*. An Article III judge was available and presided over the contested stages of trial via speakerphone. This is not the case of a judge who completely abdicated his judicial responsibilities, as in *Mortimer*, but rather the case of a judge who presided telephonically at important stages of the trial. Because Fofana has not directed our attention to any prejudice that occurred as a result of the trial judge's absence from the courthouse, we refuse to disturb his conviction on these grounds. *See Love*, 134 F.3d at 605.

## III.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the defendants' convictions and sentences.

$750 after their INS interview. Fofana provided additional assistance by filling out any necessary paperwork and would pay up to $200 for anyone who would recruit other prospective spouses willing to "sponsor" a foreign national.

On September 24, 1998, Yaya Kone, a citizen of the Ivory Coast, married Beverly Collins, a United States citizen, in Findlay, Ohio. Afterward, Kone submitted INS form I-485, a petition for adjustment in status, indicating that he had never sought to procure a visa by fraud or willful misrepresentation of a material fact.

On July 27, 1999, Feranba Keita, a citizen of Sigiri, Guinea, married Tasha Coleman, a United States citizen, in Findlay, Ohio. Thereafter, Keita submitted INS form I-485 indicating that he was living at 509 W. York, Ave., Flint, Michigan, Coleman's address, and that he had never sought to procure a visa by fraud or willful misrepresentation of a material fact.

On November 17, 1999, the government filed an 18-count indictment in the United States District Court for the Eastern District of Michigan against Fofana, Kone, and 26 other defendants, charging conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The indictment also charged Kone with visa fraud, in violation of 18 U.S.C. § 1546. A superseding indictment was filed on December 29, 1999, that charged Kone and Keita with visa fraud, in violation of 18 U.S.C. § 1546, and Fofana with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. All three defendants entered pleas of not guilty and the case proceeded to trial.

At the close of trial, Kone and Keita separately moved for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29. The court denied these motions.

The jury found Kone and Keita guilty of visa fraud in violation of 18 U.S.C. § 1546, and the district court sentenced both defendants to terms of six months' imprisonment and two years of supervised release. The jury found Fofana guilty

of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and the district court sentenced Fofana to 46 months' imprisonment and two years of supervised release.

All three defendants filed timely appeals raising, in total, five issues for our review.

## II.

## ANALYSIS

### A.

### Motions for Judgment of Acquittal

Kone and Keita contend that the district court erred when it denied their motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

We review *de novo*, a district court's refusal to grant a motion for judgment of acquittal. *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). The relevant inquiry "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This rule applies whether the evidence is direct or circumstantial. *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). Moreover, "[i]t is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." *Id.*

To convict for visa fraud, in violation of 18 U.S.C. § 1546, the government must prove that: (1) the defendant made a false statement under penalty of perjury with respect to a material fact; (2) the statement was made in an application, affidavit, or other document required by the immigration laws or regulations; and (3) the defendant made the statement knowing that it was false. 18 U.S.C. § 1546(a).

that in order to prevail, Fofana is required to show that the procedures used resulted in actual prejudice.

In *Love*, the Fourth Circuit considered whether a judge's absence from the courtroom during defense counsel's closing arguments resulted in structural error. The court reasoned: "While absent from the courtroom during portions of the closing argument, the district judge was in his chambers and available to exercise his discretion with respect to objections made by either side." *Love*, 134 F.3d at 605. Because the defendants did not object below, and did not point to any specific comments made during the district judge's absence that affected the trial's fairness, the Second Circuit sustained the judgments of conviction. *Id.*

In *Grant*, the Second Circuit considered whether a trial judge's absence from the courtroom during the read-back of witness testimony violated the defendant's right to a fair trial. The Second Circuit concluded: "While we do not encourage trial judges to absent themselves from the bench, and recognize that absence under many circumstances would involve error, practical distinctions must be observed." *Grant*, 52 F.3d at 449 (internal citations omitted). The court concluded that absent a showing of prejudice, no error existed. *Id.*

Finally, in *Pfingst*, the Second Circuit considered whether a trial judge's absence from the courthouse during jury deliberations while he was delivering a speech at the Fifth Circuit Judicial Conference constituted reversible error. While away, the trial judge remained in constant communication with his law clerk via telephone regarding any jury questions. *Pfingst*, 477 F.2d at 195. The court held: "While the practice is not to be encouraged, we cannot say in this day and age of modern communication and transportation it is reversible error for the trial court not to be *physically present* at the courthouse during deliberations for a reasonably short period without some showing of specific prejudice to a defendant." *Id.* at 196-97 (emphasis added).

verdict was taken, and when the jury was polled, resulted in structural error, thereby denying Fofana the right to a fair trial.

After the jurors retired to deliberate, United States District Judge Paul Gadola, who presided over the trial in Flint, Michigan, departed the courthouse to attend the Sixth Circuit Judicial Conference in Cincinnati, Ohio. Because the trial was not completed before he was required to leave for the conference, Judge Gadola arranged for United States District Judge Bernard Friedman to handle jury questions that might arise during deliberations and to receive the verdict, via speakerphone, from Judge Friedman's Detroit chambers. Neither party objected to this arrangement. On June 1, 2000, Judge Friedman took the verdict and polled the jurors, who unanimously found defendant Fofana guilty of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371.

Fofana urges us to consider the Third Circuit's decision in *United States v. Mortimer*, 161 F.3d 240 (3d Cir. 1998), and to conclude that the procedures used constituted structural error, that is, a "defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." *Arizona v. Fulminante* 499 U.S. 279, 309 (1991). In *Mortimer*, the trial judge absented himself during the defense counsel's summation and, consequently, was unavailable to rule on the prosecution's objections. *Mortimer*, 161 F.3d at 241. Finding structural error, the Third Circuit reasoned: "A trial consists of a contest between litigants before a judge. When the judge is absent at a 'critical stage' the forum is destroyed." *Id.* (citing *Gomez v. United States*, 490 U.S. 858, 873 (1989)).

The government, on the other hand, urges us to consider *United States v. Love*, 134 F.3d 595 (4th Cir. 1998), *United States v. Grant*, 52 F.3d 448 (2d Cir. 1995), and *United States v. Pfingst*, 477 F.2d 177 (2d Cir. 1973), and to conclude that because an Article III judge maintained control over the proceedings by telephone, structural error did not occur, and

## 1.

### Yaya Kone

Kone contends that on his INS petition for adjustment in status, he truthfully stated that he was not seeking to procure a visa by fraud or willful misrepresentation. The government contends that Kone attempted to procure a visa by way of a sham marriage.

We are persuaded by the following evidence that the district court did not err when it denied Kone's motion for judgment of acquittal: Beverly Collins's testimony that she was recruited to participate in Fofana's marriage sham scheme and promised a total of $1000 to marry Kone; Collins's testimony that she had spent less than one hour with Kone prior to their marriage in September 1998; and testimony indicating that after the Ohio wedding ceremony the group returned to Michigan and Collins received a partial $500 payment, was dropped off at her house, and spent her wedding night alone. Although Collins admitted to having sexual relations on one occasion with Kone, she acknowledged that they never lived together. Additionally, Kone's employment records corroborate that he maintained a separate residence in New York after the marriage. Also after the marriage, Kone did not provide financial assistance to Collins other than $50 he left in a joint bank account. Gail Johnson, who married Mohamed Bamba on the same day that Kone married Collins, corroborated Collins's story. Moreover, Mohamed Bamba, N'Guanouho Bamba, and Mamadou Camara testified that Kone told them that Fofana had arranged his marriage to Collins for $4000, and that because of potential problems with his INS paperwork, he moved from New York back to Michigan.

When viewing the evidence in a light most favorable to the government, we conclude that the government met the standard as set forth in *Jackson*. *Jackson*, 443 U.S. at 319.

The district court did not err when it refused to grant Kone's motion for judgment of acquittal.

## 2.

### Feranba Keita

Keita contends that the allegedly fraudulent statement listed on his I-485 application for status as a permanent resident (that he was living at 509 W. York Ave., Flint, Michigan) was not a material fact and, therefore, the district court erred when it denied his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

The parties agree that materiality, in the context of a Section 1546 prosecution, is defined as "a natural tendency to influence, or [] capab[ility] of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation marks and citations omitted). Under a set of virtually indistinguishable facts, the Fifth Circuit determined that listing a fraudulent address on a defendant's I-485 petition was a material fact because "it was capable of affecting the functioning of a governmental agency, in this case the INS." *United States v. Al-Kurna*, 808 F.2d 1072, 1075 (5th Cir. 1987).

The fact that Keita's application was incomplete is immaterial to whether he violated 18 U.S.C. § 1546(a). Nowhere does the statute require that the agency actually make a determination based on the fraudulent misstatements; rather, the statement need only be *capable* of influencing the decisionmaking body, here the INS. Clearly, Keita's statement that he was living at a certain address with his "wife," Tasha Coleman, is material to the INS's determination of whether to grant Keita permanent residence status based on a legitimate marriage to a United States citizen.

9. Testimony from Jerrell Wynn that Jessie Wynn told him he was getting paid to get married and "for citizenship"; and

10. Testimony from Mohamed Bamba that "friends" had pointed Noha Fofana out to him as a person who could get him a wife.

Regrettably, the district court did not make specific findings to support how, in its view, the government had met its burden as to each of the Rule 801(d)(2)(E) elements with respect to each of the contested statements. While we have not heretofore mandated a particular degree of specificity with respect to the *Enright* findings, in *Curro*, 847 F.2d at 329, we held "that a mere conclusory statement will not always suffice" when the government has not met its burden of proof. Our review of the record does not satisfy us that the government carried its burden with respect to proving each of the *Enright* elements with respect to some of the challenged testimony. In fact, most, if not all, of the challenged statements are made by non-conspiratorial declarants and are, consequently, clearly inadmissible under 801(d)(2)(E). In addition, we are not satisfied that all of the challenged statements were made "in furtherance" of the conspiracy alleged.

Nevertheless, we are satisfied that the record contains overwhelming evidence of Fofana's guilt, including the direct, unimpeached, non-hearsay testimony of some of his coconspirators. Therefore, to the extent the district court abused its discretion in its ultimate determination to admit the statements, any resulting error was harmless.

### E.

### Trial Judge's Physical Absence: Structural Error

Fofana contends that the trial judge's absence from the courthouse during jury deliberations, at the time the jury's

furtherance of the alleged conspiracy and, as a consequence, the statements do not fit under the coconspirator exception to the hearsay rule.

1.  Testimony from Joyce Mullins that Jerrell Wynn told her that he was paid money to marry Matiangue Kamara;

2.  Testimony from Keisha Jackson that her husband (Hamidou Kante) told her that the INS was checking on the marriages, about covering up their fraud, and about how she would testify if called;

3.  Testimony from Mamadou Camara that Mory Bamba told him he paid Noha Fofana to make his marriage arrangements;

4.  Testimony from Mamadou Camara that Lassine Soumahoro told him he paid Noha Fofana to make his marriage arrangements;

5.  Testimony from Mamadou Camara that Moussa Somahoro told him he paid Noha Fofana to make his marriage arrangements;

6.  Testimony from Tamara Malone that an unidentified bride told her that "we're getting paid to get married and stuff";

7.  Testimony from N'Guanouho Bamba that Mamadou Diaby told him that both he and his cousin, Yaya Diaby, paid Noha Fofana to arrange marriages;

8.  Testimony from N'Guanouho Bamba that Hamidou Kante told him that he had paid Noha Fofana to arrange his marriage;

We conclude that the district court did not err when it denied Keita's motion for judgment of acquittal because the statement on his I-485 application for status as a permanent resident—that he was living at 509 W. York Ave., Flint, Michigan—was a material fact that had the capability of affecting the decision of the INS in granting Keita's permanent residence status.

**B.**

**Jury Instruction on Materiality**

Keita contends that the district court committed reversible error when it refused to supplement the jury instruction on materiality to include a statement that the government maintained the burden of proof.

This court reviews a jury instruction to determine whether it was a correct interpretation of the relevant law. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000). If the trial court's interpretation of the law was erroneous, our review focuses on whether the erroneous interpretation was prejudicial. *Id.* We will reverse a jury verdict only when the jury instructions, "as a whole, are confusing, misleading, and prejudicial." *Id.*

Keita asks us to consider whether the definition of materiality given to the jury impermissibly shifted the burden to Keita to prove a disqualifying fact, thus requiring reversal of his conviction and sentence. The district court defined materiality as:

> A statement or representation . . . [that] has a natural tendency to influence or is capable of influencing a decision or action of the federal agency. To be material it is not necessary that the statement or representation in fact influenced or deceived.

Keita contends that the district court erred when it did not add the following language to its materiality definition:

[T]he prosecutor has the burden of proving materiality beyond a reasonable doubt and the defendant does not have to show that the statements or representations could [not] have influenced the decision or action of the federal agency.

To support the application of this supplemental language, Keita relies on two Supreme Court decisions: *United States v. Gaudin*, 515 U.S. 506 (1995); and *Kungys v. United States*, 485 U.S. 759 (1988).

Keita asks this court to read *Gaudin* and *Kungys* together to mean that, in the criminal setting, a jury instruction on materiality must indicate that the government has the burden of proof, and that the burden does not shift to the defendant to show that the statements or representations could not have influenced the decision or action of the federal agency. Keita relies on Justice Stevens's concurring opinion in *Kungys*—that the definition of materiality, similar to the definition used here, impermissibly shifts the burden to the defendant to rebut the existence of a disqualifying fact. First, we note that Justice Stevens's concurring opinion does not represent the majority holding. *Kungys*, 485 U.S. at 784. Second, we read *Gaudin* to hold merely that when materiality is an element of the charged offense, the issue of materiality must be submitted to the jury. *Gaudin*, 515 U.S. at 522-23. Nothing in *Gaudin* suggests that the materiality definition given in that case impermissibly shifts the burden of proof to the defendant. Interestingly, in *United States v. Blasini-Lluberas*, 169 F.3d 57, 67 (1st Cir. 1999), the First Circuit held that a district court's complete failure to define materiality did not result in plain error. *Id.*

As to this case, we hold that the district court properly submitted the issue of materiality to the jury as required by *Gaudin*. Prior to giving the materiality instruction, the district court reminded the jury, "you must be convinced that the Government has proved each and every one of the following elements beyond a reasonable doubt. . . . If you have a

statements were not shown to have been made in furtherance of the conspiracy.

A statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by a coconspirator of a party [made] during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). A party attempting to offer the statement of a coconspirator must show that: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the coconspirator's statement was made in the course and in furtherance of the conspiracy. *See United States v. Enright*, 579 F.2d 980, 986 & n.7 (6th Cir. 1978). Whether the offering party has met this burden is a preliminary question of fact for the trial judge and is reviewed for clear error. *United States v. Breitkreutz*, 977 F.2d 214, 218 (6th Cir. 1992); *see* FED. R. EVID. 104(a). A trial judge may, however, conditionally admit alleged coconspirator statements subject to a later determination of their admissibility. The ultimate 801(d)(2)(E) ruling is reviewed for an abuse of discretion. *United States v. Curro*, 847 F.2d 325, 328 (6th Cir. 1988), *overruled on other grounds*, *United States v. Gomez-Lemos*, 939 F.2d 326, 332 (6th Cir. 1991).

During the testimony of Joyce Mullins—one of the initial government witnesses—defense counsel made what he called "a standing objection" to Mullins's hearsay testimony, anticipating that the government would fail to prove the required *Enright* elements with regard to certain portions of Mullins's testimony and similar testimony counsel anticipated would be forthcoming from other government witnesses. The district court conditionally admitted the contested statements subject to a later determination of their admissibility. At the close of proofs, the district court concluded "by a preponderance of the evidence that [the *Enright*] elements have been satisfied in this case."

On appeal, Fofana argues that the district court abused its discretion when it admitted the following ten statements because the statements were not shown to have been made in

justified or not, they would realize a benefit from testifying for the government.

The district court was given very little help by defense counsel in understanding counsel's impeachment theory, and was given no help at all by the Assistant United States Attorney, who apparently thought counsel's impeachment was for bad character (prior conviction) rather than for bias. However, well articulated or not, defense counsel was attempting to show that the witnesses had, at most, an expectation and, at least, a hope of later favorable treatment by the government with respect to their own criminal troubles. Although the force of this sort of impeachment—to show bias based upon an expectation of later favorable treatment by the government—is extremely weak, it is nevertheless a legitimate rationale for impeachment on cross-examination.

That having been said, we think defense counsel had the burden of making clear to the trial court, in an articulate and plainly stated fashion, the nature and purpose of his cross-examination and that he failed to do so. Consequently, we cannot conclude that the district court abused its discretion in failing to understand the defense counsel's rather abstruse and poorly explained impeachment theory. Moreover, given the overwhelming weight of the direct evidence of Fofana's guilt, we think that the district court's failure to permit these witnesses to acknowledge—if indeed they would have—that they expected favorable treatment from the government, although none was promised, would have been of such minimal benefit to the defendant that the district court's rulings precluding such impeachment did not result in any unfair prejudice.

### D.

### Admissibility of Coconspirator Statements

Fofana contends that the trial court committed reversible error when it admitted ten hearsay statements, pursuant to Federal Rule of Evidence 801(d)(2)(E), because the

reasonable doubt about any one of these elements, then you must find the defendant[] not guilty of these charges." The court then proceeded to define materiality verbatim from O'MALLEY, FEDERAL JURY PRACTICE AND INSTRUCTION § 16.11 (5th ed. 2000), and in accord with the Supreme Court's mandate in *Kungys*. The district court reminded the jury both before it gave the materiality instruction and on several occasions during the jury charge that the government maintained the burden of proof. Keita's reliance on *Gaudin* and *Kungys* is misplaced in that *Gaudin* merely stands for the proposition that when materiality is an element of the offense, it must be submitted to the jury. Justice Stevens's concerns in *Kungys* that the Court's definition impermissibly shifts the burden to the defendant to rebut the existence of a presumed disqualifying fact did not garner a majority.

For these reasons, we conclude that the district court's jury instruction regarding materiality fairly and adequately submitted the issues and applicable law to the jury.

### C.

### Limitation of Cross-Examinations on Bias

Fofana contends that the district court abused its discretion when it limited the cross-examination of certain prosecution witnesses as to whether they had an *expectation* of favorable treatment from the government in exchange for their testimonies. The government disagrees, contending: first, Fofana did not properly preserve this issue for review; second, any limitation on the witnesses' testimony was not an abuse of discretion; and finally, even if the court abused its discretion, any error in this regard was harmless.

When a trial court limits the scope of cross-examination, this court reviews that determination for an abuse of discretion. *Stevens v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984). In assessing whether the district court abused its discretion, a reviewing court must decide "'whether[, despite the limitation of cross-examination,] the jury was otherwise

in possession of sufficient information . . . to make a "discriminating appraisal" of a witness' motives and bias.'" *Id.* (quoting *United States v. Touchstone*, 726 F.2d 1116, 1123 (6th Cir. 1984)). If it is determined that the trial court abused its discretion, the reviewing "court must then consider whether the constitutional error is harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18 (1967)). Harmless error is "[a]ny error, defect, irregularity or variance which does not affect substantial rights . . . ." Fed. R. Crim. P. 52(a).

The Sixth Amendment to the United States Constitution provides that a criminal defendant has the right to confront witnesses against him. U.S. CONST. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). We recognize, however, that a trial court may, in its sound discretion, limit the scope of cross-examination. *Bordenkircher*, 746 F.2d at 346. In *Alford v. United States*, 282 U.S. 687 (1931), the United States Supreme Court held that a court may not, however, limit cross-examination which tends to prove that a witness's "testimony [is] biased because given under promise or *expectation* of immunity." *Id.* at 693 (emphasis added). The Sixth Circuit has developed a line of cases applying the rule set forth in *Alford*. *See, e.g.*, *Wright v. Dallman*, 999 F.2d 174, 179 (6th Cir. 1993); *Bordenkircher*, 746 F.2d at 346; *Touchstone*, 726 F.2d at 1122; *United States v. Leja*, 568 F.2d 493, 497 (6th Cir. 1977).

We begin by determining whether Fofana adequately preserved this issue for review. Fofana contends that the district judge stated that an objection for one *defendant* would be treated as an objection for all of the defendants. Consequently, Fofana did not make any separate objection to the trial court's rulings limiting Fofana's cross-examination of several witnesses for bias, specifically regarding their expectation of favorable treatment by the government. In our view, the trial court's statement, to which Fofana refers, in no way implies that an objection with respect to one *witness* would be treated the same for another *witness*. In order to

[DEFENDANT'S COUNSEL]: It would be my position, Your Honor, that actions speak louder than words. And if these --

THE COURT: I'm sorry, but that's not appropriate.

[DEFENDANT'S COUNSEL]: Okay. Thank you, Your Honor.

While there is serious question whether Fofana's attorney adequately informed the trial judge of his purpose for pursuing this line of questioning during the cross-examinations of Page and Jackson, we conclude that the record shows that the attorney was attempting to impeach the witnesses by showing bias; specifically, whether the witnesses *expected* that if they cooperated with the government, they would not be indicted and/or charged for their participation in the conspiracy.

It appears to us that Fofana's attorney and the trial court were "as ships passing in the night," in that the attorney's objection was based on one theory of impeachment and the trial court's understanding was that counsel was pursuing a different theory of impeachment.

As best we can determine, now that we have the benefit of appellate briefing and clarifying oral argument, the purpose of counsel's cross-examination, although poorly explained to the district court, was to inquire whether the government witnesses understood that if they testified as the government wished, they would not later be indicted or charged for their own criminal activity. Counsel was not inquiring whether the government had made any *explicit promises* to the witnesses justifying such understanding; rather, he wanted to learn whether, despite the absence of any explicit promise of favorable treatment by the government, the witnesses, merely by testifying favorably to the government, understood they would be given some reward. The inquiry, then, was whether the witnesses' state of mind was that they believed, whether

matter that could go to her credibility. But I don't see the purpose of pursuing this matter frankly.

(Emphasis added.)

### b.  Keisha Jackson

The relevant colloquy during Jackson's cross-examination is as follows:

Q    Ms. Jackson, do you have -- did the Government make any kind of promises to you in connection with your cooperation?

A    No.

Q    But you haven't been charged, have you?

[PROSECUTOR]:  Your Honor, I'm going to object again.  Same line of questioning as with the last witness.

[DEFENDANT'S COUNSEL]:  Your Honor, may I respond?

THE COURT:  Yes.

[DEFENDANT'S COUNSEL]:  Okay.  It's my position that the agreement doesn't have to be in writing. The agreement doesn't have to be even verbally stated. An agreement by actions can be as strong as an agreement in words.

THE COURT:  Oh, I don't -- I don't think so there, no, no.  There has to be an agreement.  You're asking whether the Government has promised her something or there has been an agreement not to charge her.  They can't -- the agreement can't be just out of thin air.

preserve an issue for appeal, therefore, Fofana's attorney was obligated to object each time the trial judge limited the attorney's efforts to cross-examine a particular witness.  A colloquy between Fofana's attorney and the court illustrates this point.  The court stated:  "I'm not going to recognize a standing objection to this situation. . . .  We'll treat each situation as it arises."

Notwithstanding, our review of the record indicates that Fofana's attorney did raise specific objections during the cross-examinations of three prosecution witnesses:  Joyce Mullins, Monica Page, and Keisha Jackson.  We limit our review to whether the district court abused its discretion when it limited the cross-examinations of these three witnesses.

### 1.

### Joyce Mullins

The relevant colloquy during Mullins's cross-examination stated:

Q    Okay.  Now were you ever indicted for the --

[PROSECUTOR]:  Your Honor, I'm going to object, this is irrelevant.

THE COURT:  What's the relevance of that?

[DEFENDANT'S COUNSEL]:  Your Honor, I don't know if it's irrelevant or not.  It may go to her motivation or bias or testifying in this case if she was promised something on that case that she would not have been prosecuted on, clearly this indicated her involvement in there.

[PROSECUTOR]:  The Government has indicated that this witness has been promised immunity and that she was paid money as a confidential informant in both investigations.  The fact that she may have had -- been

charged in the past is irrelevant. Charges are not appropriate questions.

THE COURT: I'll sustain the objection. She has testified that she has been promised immunity and that she also received some compensation.

With respect to Mullins, we conclude the trial court did not abuse its discretion in limiting Fofana's attorney's cross-examination, because the jury possessed sufficient information—that Mullins had been given immunity and had been paid compensation in exchange for her testimony— to make a "discriminating appraisal" of Mullins's motives and bias. *Bordenkircher*, 746 F.2d at 347.

### 2.

### Monica Page & Keisha Jackson

### a. Monica Page

The relevant colloquy during Page's cross-examination is as follows:

Q   Ms. Page, have any -- have any promises been made to you in connection with your testimony today, or your cooperation?

. . . .

Q   . . . Did the Government promise you anything?

A   No.

Q   Have you now -- *you're [sic] understanding*, have -- is it *your understanding* that if you cooperate with the Government they will not be charging you in connection with this marriage?

A   No.

Q   That's not *your understanding*?

A   No.

[PROSECUTOR]: Objection, Your Honor, she's -- this has been asked and answered. She said there were no promises made to her.

THE COURT: She's answered your question, I believe.

Q   Do you think that you will be charged?

[PROSECUTOR]: Your Honor, objection. She cannot anticipate what the Government's going to do.

[DEFENDANT'S COUNSEL]: Your Honor, I think *her understanding* is important.

[PROSECUTOR]: And her understanding [is], Your Honor, that there are no *promises* from the Government in exchange for her testimony.

THE COURT: I thought she answered your question. She said that she hasn't been -- she hasn't been made any *promises*.

[DEFENDANT'S COUNSEL]: Can I ask her if she has been charged?

[PROSECUTOR]: Your Honor, I'm going to continue this objection. Charges are inappropriate.

[DEFENDANT'S COUNSEL]: Your Honor --

[PROSECUTOR]: She's testified about her prior convictions.

THE COURT: Yeah, the charge would only be relevant if she'd been convicted and then it would be a