NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0369n.06

Case No. 20-5813

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | ) | **FILED** |
| UNITED STATES OF AMERICA, | ) | Jul 26, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| DANNY COLLINS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**BEFORE: BATCHELDER, WHITE, and DONALD; Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge**. Defendant-Appellant Danny Collins appeals after a jury found him guilty of various drug and felon-in-possession charges. Specifically, Collins claims that the district court's prohibition on recross examination without leave of court is structural error mandating reversal. For the reasons stated below, we AFFIRM Collins' conviction.

I.

In June of 2019, Collins was indicted on three counts. Count One charged Collins with conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged Collins with possession of a firearm in furtherance of

a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). Finally, Count Four[1] charged Collins with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). An investigation conducted by federal, local, and state police purported to show that Collins and four others (Samantha Collins, Kevin Quillen, Michael Slone, and Sabrina Chaffins) were involved in a conspiracy to distribute methamphetamine and that Collins "supervised" and led the conspiracy. At his initial appearance and arraignment, Collins pleaded not guilty. The district court then conducted a two-day jury trial on March 12 and 13, 2020. The government called seven witnesses.

*Michael Slone*. The government's first witness, Michael Slone, was an acquaintance of Collins who testified on direct examination that he went with Collins to Louisville, Kentucky to introduce Collins to methamphetamine suppliers. Slone also testified that Collins would bring a pistol with him each time the two traveled to Louisville. Slone, charged in the same indictment as Collins, also testified as to his own guilty plea. On cross examination, Collins' counsel asked Slone if he expected anything in return for his testimony. Slone responded that he was expecting nothing and that nothing was "built into [his] plea agreement" in exchange for his testimony. On redirect, Slone testified that at the time he made his initial statement to law enforcement (in which Slone provided a list of individuals involved in the sale of methamphetamine), he had no plea agreement, nor had anyone made any promises to him. He did concede that in his plea agreement, he agreed to continue to cooperate and would "lose everything" (i.e., cooperation credit) if he perjured himself in his testimony. Collins' counsel did not request any recross, instead telling the trial court that he had no further questions.

---

[1] Count Three charged only Samantha Collins, Collins' daughter, with possession of a firearm in furtherance of a drug-trafficking offense.

**Omar Sandlin.**  As its second witness, the government called Oman Sandlin, a Kentucky State Police detective involved in the investigation of Collins.  On direct, Sandlin testified that a confidential informant named Scotty Couch contacted Sandlin, as a result of which law enforcement used Couch in eight separate controlled buys.  In performing those controlled buys, Couch had with him a recording device that captured the buys; when the government moved to introduce those videos into the record, Collins' counsel stated that he had viewed the eight videos and had no objection.  Sandlin also testified that the packages obtained from the controlled buys tested positive for methamphetamine.

On cross, Collins' counsel questioned Sandlin about Couch's motivation in acting as a confidential informant, i.e., that Couch was under indictment at the time and would have expected to receive some leniency for his cooperation.  At a sidebar conference, defense counsel pointed out to the district court that one of the videos appeared to not record a "very important part of the video."  Counsel "want[ed] to know why [Couch] misses trying to photograph something that would be that important."  Back in front of the jury, Sandlin agreed with counsel that it would be "odd" if a confidential informant failed to record something important if the informant intentionally hid the camera.  Defense counsel also asked Sandlin about the lack of fingerprints taken from the baggies of drugs obtained from the controlled buys; Sandlin testified that the Kentucky State Police practice is to not take fingerprints from the bags, given the potential harm of coming into direct contact with the substance.  Finally, defense counsel asked how much money Couch might have received from law enforcement.  Specifically, Collins' counsel stated:

> Q:     And if I told you that the information supplied from the U.S. Attorney's Office involving [Couch]  was, there was $800 on this, and then another $1,200, and then another $2,700, unless the 800 is included somewhere in there.  So that comes to almost $4,000.  $3,900 altogether.  Would that surprise you?
>
> A:     No.

On redirect, the government asked Sandlin whether "the Kentucky State Police paid for, the totality of all of those buys, approximately $800," to which Sandlin responded affirmatively. The government then asked Sandlin about the video recordings of the controlled buys; Sandlin testified that Couch created a "good quality video" from the controlled buys and that he did not see any evidence Couch was attempting to hide anything from the camera. Next, the government asked Sandlin about law enforcement's attempts to surveil Collins' trailer and the difficulties in doing so given the tint of the windows. The government asked Sandlin to describe "the area [i.e., the trailer] and, more importantly, the tint of the windows." Sandlin responded that law enforcement did have several vehicles surveilling the trailer but that they could not see inside the trailer. The district court then interrupted, advising the government to "watch the scope of your redirect. I'm not sure that's responsive to the cross." The government returned to asking about the allegedly missing part of the video, asking Sandlin whether the tint (and the resulting darkness inside) could have caused the video to go "black" at certain times; Sandlin responded affirmatively, agreeing that there was little natural light inside the trailer.

At this point, Collins' counsel requested recross. The following took place at a sidebar conference:

| | |
|---|---|
| District Court: | I only allow recross with leave. So what do you want to recross on? |
| Defense Counsel: | Well, I was going to ask [Sandlin] about the number of investigations that this young man [i.e., Couch] has done, how many trips, to try to equate the money to it. It's hard. |
| District Court: | I think it is covered. |
| Defense Counsel: | All right. Thank you. |

***Scotty Couch***. The government then called its third witness, Scotty Couch, who testified on direct to the eight controlled buys he conducted on behalf of law enforcement in their investigation of Collins and others. The government introduced the video recordings of those

controlled buys. On cross, Collins' counsel asked Couch how many "trips" he made for the Collins investigation and how much he made for each; Couch responded that he performed eight buys and received approximately $100 per trip. Couch also noted that at the time of the Collins investigation he was involved in other law enforcement investigations. On redirect, the government asked about the source of the $3,900 that Couch purportedly received from the totality of his cooperation (given his testimony that he made only $800 for the Collins investigation); this testimony clarified that Couch made money from other Kentucky State Police and ATF investigations rather than $3,900 from the Collins investigation alone. At the conclusion of redirect, the district court excused the witness. Collins' defense counsel did not request any recross.

**Barry Engle**. The government's fourth witness was Barry Engle, a retired Kentucky sergeant. On direct, Engle testified to the execution of the search warrant on Collins' residence on March 12, 2018. He testified that law enforcement found Collins unconscious in his pickup truck, where police found over 26 grams of methamphetamine. Engle also testified that when law enforcement searched the residence, they found a safe; Collins opted to open that safe so that law enforcement would not have to destroy it. Collins then led officers to the safe where he entered the correct combination; inside that safe was over 500 grams of methamphetamine. On cross, Engle clarified that there were two safes found inside; he accompanied Collins to the gun safe (as described on direct) but does not know what was found in a separate, smaller safe. He also clarified that Collins and his daughter, Samantha, were not placed together in the same police vehicle before Collins went in and opened the gun safe. On redirect, the government asked Engle why they would have kept Samantha and Collins separate; Engle responded that they did so to ensure the two did not "coincide their stories together." Engle also reiterated that Collins opened the larger gun safe but that he believed Samantha opened the separate smaller safe. Engle also testified that no one

had the chance to give Collins the gun safe's combination, i.e., that Collins knew the combination himself. At the conclusion of redirect, Collins' counsel made no request for recross, and the district court excused the witness.

*Alisha Congleton*. The government's next witness, Alisha Congleton, was a Letcher County officer at the time and, like Engle, she testified to the details of the search warrant execution. On direct, she confirmed much of Engle's previous testimony. She found Collins passed out in what she believed was a black Mazda pickup truck. She also testified to the search of two separate safes; officers found one small safe in Samantha's room, which Samantha herself opened. The other safe was located in Collins' bedroom, and Collins entered the house with officers to open that safe. Congleton explained that officers first asked Samantha if she knew the code to the safe in Collins' bedroom, but that she did not, so officers asked Collins to open that larger safe. On cross examination, Collins' counsel asked Congleton only about the pickup truck and whether she knew if it was a Mazda or a Ford. On a brief redirect, the government asked Congleton to clarify whether she thought Collins was found in a Mazda or Ford. Collins' counsel did not thereafter request any recross, and the court excused the witness.

*Jeffrey Baker*. Next, the government called Jeffrey Baker, a special agent with the ATF. Baker testified on direct to the procedures law enforcement used with the controlled buys and noted that he never had any issues using Couch as an informant. Baker also testified that law enforcement found over $10,000-worth of methamphetamine at Collins' residence during the March 12 search. On cross, Collins' counsel asked Baker whether law enforcement used any marked money; Baker responded that the money was prerecorded but that no investigation was conducted to determine if any marked money was recovered. Nor did law enforcement take any fingerprints from a weapon allegedly purchased during one of the drug transactions. Next, defense

counsel asked Baker specifically about the March 2 search (the search during which Collins appears to claim the informant Couch failed to record something on the video). On redirect, the government pulled back up the video from the March 2 search and asked Baker what he believed was covering the camera at one part of the video. Baker responded that he believed it was "his" hand (i.e., Collins' hand). At a sidebar, defense counsel objected to Baker's purported identification of the hand as Collins' hand. Rather than sustain the objection, the district court offered defense counsel "limited recross on that basis[.]" After first agreeing to conduct that limited recross, defense counsel "changed [his] mind[,]" and Baker was excused.

*William Farley*. Finally, the government called William Farley as its last witness; Farley is Collins' brother-in-law. He testified on direct to living next door to Collins' residence where he saw a significant volume of vehicle traffic that was indicative, to him, of drug trafficking. The government also asked Farley about a statement he allegedly made to law enforcement on March 29, 2018; specifically, the government asked Farley whether he told ATF officers that Collins admitted to being a meth dealer. Farley responded with "if I said that, I probably said it . . . I'll be honest, I suspected things, but it wasn't something that I wanted to be associated with." Farley also responded that he remembered telling officers that he knew Collins and Samantha were "heavily involved in the illegal drug trade." On cross, defense counsel briefly asked Farley about Collins' social security payments and Farley's custody of Collins' minor child. There was no redirect, and the government then rested. Collins rested without calling any witnesses.

The jury then returned a verdict of guilty on all three counts. On July 13, the district court entered final judgment and sentenced Collins to 251 months' imprisonment, toward the lower end of the relevant Guidelines range as established in the PSR. Collins then timely appealed, claiming as error only the district court's refusal to permit some recross-examination.

II.

Neither party clearly proffers the appropriate standard of review to apply here.[2]  On the one hand, when a party does not contemporaneously object to a purported error below (as Collins failed to do here), we generally review for plain error.  *United States v. Milan*, 398 F.3d 445, 450-51 (6th Cir. 2005).  On the other hand, even when "plain-error review might have been available for this claim," when neither party requests plain-error review—as is the case here where the government asks that we apply the abuse-of-discretion standard—we will typically not apply

---

[2] Collins asserts that the error was structural and mandates automatic reversal, but Collins does not clearly argue how or why the purported error here falls within the "very limited class of cases" that affect the "framework within which the trial proceeds[.]"  *See Johnson v. United States*, 520 U.S. 461, 468 (1997) (quotation and citation omitted).  That "very limited class of cases" includes, for example, the total deprivation of the right to counsel, the lack of an impartial trial judge, the right to self-representation at trial, and the right to a public trial.  *Id.* at 468-69 (citing, in relevant part, *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Tumey v. Ohio*, 273 U.S. 510 (1927); *McKaskle v. Wiggins*, 465 U.S. 168 (1984); *Waller v. Georgia*, 467 U.S. 39 (1984)).

In arguing that the error here was structural rather than subject to harmless error review, Collins says that the effects of being forced to seek leave to recross "are simply too hard to measure" because "[w]e cannot know what recross examination would yield," parroting an example of structural error described by the Supreme Court.  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017); [Appellant Br. at 24].  Yet, in his appellate briefing, Collins—presumably with the benefit of hindsight—sets forth for some of the witnesses precisely what he would have asked that witness on recross had he sought leave to recross and had the court granted it.  And the questions that Collins says he would have asked on recross were already covered in previous testimony.  These arguments belie the point Collins seeks to make: he has told us precisely what he wanted recross to yield and we can measure that harm by evaluating what was brought out in other testimony.

Moreover, in arguing in his reply brief that the government misunderstands his claim, Collins appears to assert that the specific "constitutional error" he complains of is a violation of the Confrontation Clause.  [Reply Br. at 1-4].  And it is well established that Confrontation Clause errors are subject to harmless-error analysis and are not treated as structural errors.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("improper denial of a defendant's opportunity to impeach a witness . . . like other Confrontation Clause errors, is subject to [] harmless error analysis").

Collins goes on to claim that the system used by the district court—requiring leave before any recross—improperly delegates to the district court the determination of whether recross is appropriate; instead, Collins claims, trial counsel should make that determination.  He asserts that this "structure impinges upon and denies the right to counsel concerning the determination of whether or not to recross."  This assertion finds no support in our caselaw.  Generally, trial courts have "broad discretion in the conduct of a trial[,]" *Geisler v. Folsom*, 735 F.2d 991, 997 (6th Cir. 1984), and that broad discretion includes the discretion to limit the extent or scope of the examination of a witness.  *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989).

plain-error review. *United States v. Williams*, 641 F.3d 758, 763 (6th Cir. 2011); *see also United States v. Blackie*, 548 F.3d 395, 404 (6th Cir. 2008) (Sutton, J., concurring) ("The government never asked us to apply plain-error review to this claim, which by itself is reason enough not to apply this standard to the issue.").

Therefore, though Collins failed to object below, because the government does not ask us to apply plain-error review, we ask here whether the district court abused its discretion in allowing recross examination only with leave of court.

III.

The Confrontation Clause grants defendants the right to confront witnesses against them. U.S. CONST amend. VI. At the same time, "the right to cross-examine is not absolute." *United States v. Beverly*, 369 F.3d 516, 535 (6th Cir. 2004) (citing *United States v. Atisha*, 804 F.2d 920, 929-30 (6th Cir. 1986)). The Federal Rules of Evidence afford broad discretion to trial courts to conduct proceedings before them. *See* Fed. R. Evid. 611(a) (directing trial courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence" so as to, among other purposes, "avoid wasting time"); *see also Geders v. United States*, 425 U.S. 80, 86 (recognizing the important role of trial judges and explaining that they "must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process"). We have recognized the breadth of that discretion in two relevant ways. First, trial courts "have latitude to 'impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *Beverly*, 369 F.3d at 535 (quoting *United States v. Blakeney*, 942 F.2d 1001, 1022 (6th Cir. 1992)); *see also Van Arsdall*, 475 U.S. at 679 (recognizing that "trial judges retain wide latitude insofar as

the Confrontation Clause is concerned" to impose "reasonable limits" on the cross-examination of witnesses). Second, and more specifically relevant here, trial courts have discretion "to curtail or even to deny recross-examination if the government elicits no new matters on redirect examination." *United States v. Payne*, 437 F.3d 540, 548 (6th Cir. 2006) (citing *United States v. Odom*, 13 F.3d 949, 957 (6th Cir. 1994) and *United States v. Dandy*, 998 F.2d 1344, 1350 (6th Cir. 1993)). In *Payne*, we held that the district court did not abuse its discretion when it denied the defendant's request to recross a government witness based on allegedly "new topics" raised on redirect; we reached this conclusion by considering whether anything raised on redirect was actually new or was instead previously covered. *Id.* at 548-50.

In this case, for six of the seven witnesses, Collins either failed to request recross (Slone, Couch, Engle, Congleton) or turned down the chance to recross when explicitly offered by the district court (Baker), or there was no redirect examination after which any recross examination could have followed (Farley). The record thus flatly contradicts Collins' claim on appeal that the district court "did not allow recross" examination for these witnesses; in only one case (Sandlin) did the district court attempt to limit the scope of recross, and even then Collins failed to object. With every other witness, the district court took no action because Collins took no action. We cannot say it was an abuse of discretion for the district court to disallow Collins to do something that Collins did not even request to do. *See United States v. Kone*, 307 F.3d 430, 437 (6th Cir. 2002) ("In order to preserve an issue for appeal . . . [the defendant's] attorney was obligated to object each time the trial judge limited the attorney's efforts to cross-examine a particular witness.").[3]

---

[3] *See also Jordan v. Warden, Lebanon Correctional Inst.*, 675 F.3d 586, 594 (6th Cir. 2012) ("There is no evidence in the record that defense counsel attempted to cross-examine C.A. about her sexual history,

In the case of Sandlin, there was no new topic covered on redirect that would have merited recross, and as such, the district court did not abuse its discretion in limiting the scope of recross. As we did in *Payne*, we consider here the scope of testimony on redirect and ask whether any new topics were covered on redirect that would have merited recross. *Payne*, 437 F.3d at 549-50; *see also Odom*, 13 F.3d at 957. When Collins' counsel asked to recross Sandlin, the district court set forth its policy of allowing recross only with leave and asked counsel what he wanted to recross on. Counsel answered that he wanted to ask "about the number of investigations that this young man [i.e., Couch] had done, how many trips, to try to equate the money to it." As the district court explained at the time, those topics were already covered on cross.[4] On direct, Sandlin testified to the number of controlled buys that Couch participated in, and on cross, Collins' counsel asked Sandlin about the compensation Couch might have received for each of those buys. Collins' counsel on cross raised the specific amount of $3,900 and asked whether that total amount would surprise Sandlin. So, on redirect when the government asked Sandlin to clarify how much Couch would have received for each controlled buy, the government was not wading into previously-unexplored topics that would have merited recross. Collins' counsel raised the issue on cross, and the government responded on redirect. The district court did not abuse its discretion in explaining that the number of buys and Couch's compensation were already covered such that any further recross would have been "repetitive or only marginally relevant." *See Payne*, 437 F.3d at 548-50 (quoting *Mason v. Mitchell*, 320 F.3d 604, 633 (6th Cir. 2003)); *Odom*, 13 F.3d at 957. And

---

and Jordan admits as much. Jordan cannot now base a confrontation-clause error on his trial counsel's strategies or shortcomings in not posing these questions to C.A.").

[4] Additionally, to the extent Collins' counsel was asking Sandlin questions about *Couch*, Couch was the next witness, and Collins' counsel was able to directly ask Couch questions about the number of investigations and controlled buys that he participated in. For that reason, even if we were to find that the district court abused its discretion, any error here would be harmless because Collins had the chance to question *Couch* on the topics Collins' counsel claims he wanted to ask Sandlin *about Couch*.

notably, after the district court denied recross on the issue of Couch's compensation, Collins' counsel responded "[a]ll right. Thank you," and did not raise any objection nor request recross on any other topic. (R. 179, PageID #597).

On appeal, Collins makes a markedly different argument with respect to Sandlin, now claiming he actually would have asked about something entirely different. For the first time, he asserts that on recross he would have examined Sandlin as to his testimony on redirect regarding the poor quality of some of the video recordings that resulted from the heavy tint of Collins' windows. Collins did not request the opportunity to recross Sandlin on this issue and for that reason the argument is forfeited. *See United States v. Universal Mgmt. Servs., Corp.*, 191 F.3d 750, 758-59 (6th Cir. 1999) (noting that where an argument was "never presented to the district court" it "cannot be considered by this court."). But even if the argument were not forfeited, it would likely fail on the merits as well. Arguably, the tint of the window and the resulting quality of the video was not something raised anew on redirect because Collins' counsel brought up, on cross, the allegedly missing or obscured portion of one of the video recordings. Therefore, when the government on redirect asked Sandlin to clarify what may have caused the video to be obscured (including the tint of the windows and the resulting lack of natural light in the residence), the government was probably not encroaching into new territory that would have mandated that Collins be given a chance to recross the witness. Collins' counsel suggested Couch intentionally failed to record the scene; the government rebutted that suggestion on redirect. In any event, the district court clearly did not abuse its discretion by failing to grant recross on an issue where recross was not requested. For that reason alone, the claim fails.[5]

---

[5] We also note that it is clear the district court understood the propriety of allowing recross on any new topics raised in redirect. At one point, the district court cautioned the government to "watch the scope of your redirect" when the government asked Sandlin about the ability to see inside the residence from the outside, a topic not raised on cross. At another point, the district court *offered* Collins the chance to redirect

IV.

For six of the seven witnesses, Collins either failed to ask for recross, disclaimed the chance to recross when offered by the district court, or had no opportunity to recross because there was no redirect. With the remaining witness, Sandlin, the government raised no new topics on redirect that would have merited recross. For those reasons, the district court did not abuse its discretion, and we therefore AFFIRM.

---

when the district court believed Baker had spoken about something new on redirect (whether a hand in the video was Collins'). In that instance, the only apparent time the government expanded the scope of the witness's testimony on redirect, Collins' counsel chose not to ask anything on recross.