*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-1280

LEONARD I. PAYNE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80038—Robert H. Cleland, District Judge.

Argued: December 8, 2005

Decided and Filed: February 13, 2006

Before: MOORE, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Margaret Sind Raben, GUREWITZ & RABEN, Detroit, Michigan, for Appellant.
Dawn N. Ison, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** Margaret Sind Raben, GUREWITZ & RABEN, Detroit, Michigan, for Appellant.
Dawn N. Ison, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Leonard I. Payne ("Payne") appeals his conviction for passing counterfeit obligations, in violation of 18 U.S.C. § 472. Payne argues that the district court erred in admitting out-of-court statements under the coconspirator-statement exclusion from the hearsay definition, because (1) Payne was not a member of the conspiracy and (2) certain statements were not made in furtherance of the conspiracy. Payne also asserts that the district court improperly limited the scope of his recross-examination of a witness.

Because the statements were admissible non-hearsay and the district court did not unconstitutionally limit the scope of recross-examination, we **AFFIRM** Payne's conviction.

1

# I. BACKGROUND

On Monday, April 24, 2000, Katherine Wells ("Wells"), the asset-protection manager of a J.L. Hudson Department Store ("Hudson's") in Ann Arbor, Michigan, discovered $4,000 in counterfeit currency in the weekend's cash intake. The currency was of poor quality and was readily identifiable as counterfeit. Based on the store's video-surveillance system, Wells was able to determine that the counterfeit currency had been accepted at the men's suit department register during a sale of approximately $3,972 on the evening of Saturday, April 22, 2000. Wells identified two salespeople — Payne and Louis Myers ("Myers") — and four shoppers in the video recording of the area near that register at the time of the transaction. Both the video and a point-of-sale transaction report revealed that Payne processed the sale.

Myers observed the transaction and thought it unusual for two reasons. First, the customers selected a large amount of clothing in a short period of time while paying little attention to size or style. Second, Payne acted unusually during the transaction, showing no signs of the salesmanship that Myers had seen him employ in the past.

The events leading up to the passing of the counterfeit currency were filled in by Ollie Hall ("Hall"), a participant in the scheme. Earlier that day, Hall encountered an old friend, Fred McClure ("McClure"), at a gas station. When their conversation turned to whether Hall needed money and clothes, McClure mentioned that he had a "hookup" at the mall. Hall agreed to go to the mall with McClure, but first they went to Hall's parents' house. There, McClure and Hall were joined by two other men. McClure retrieved a bag from his car and emptied its contents, about $8,000 in counterfeit currency, on a table in the home. He explained that he typically used his "hookup" — a cashier at Hudson's who turned out to be Payne — to obtain multiple items of clothing for the price of one, with the two then splitting the clothing. This time, however, McClure had plans to use the counterfeit currency. When Hall expressed doubts that anyone would accept the currency because it was obviously counterfeit, McClure reassured him that Payne would accept it. Indeed, while at the house, McClure called Payne and then told Hall that everything would proceed as planned.

About an hour later, McClure, Hall, and the two other men left the house to go to Hudson's, with each carrying about $2,000 of the counterfeit currency. On the way, McClure had another telephone conversation with Payne. Once the four men arrived at Hudson's, McClure told the others to select the clothing they wanted, which they proceeded to do. McClure broke away from the group to speak with Payne, after which McClure told Hall that everything was fine, that everyone should choose what they wanted, and that he (McClure) had chosen the clothing that Payne wanted. Hall understood this last point to mean that McClure would deliver this clothing to Payne as payment for his role in the scheme. McClure "paid" for the clothing using the counterfeit currency that he and Hall were carrying, after which the four men exited the store leaving Payne behind. Hall confirmed that the video introduced during Wells's testimony depicted this transaction.

The group proceeded to a different Hudson's branch, where McClure and Hall returned some of the clothing they had "purchased" in order to receive a cash refund. McClure gave some of these proceeds to Hall and the two other men. At some point afterward, Hall was present when McClure spoke with Payne by telephone. Upon the completion of the telephone conversation, McClure told Hall that Payne had asked for the clothing he had selected during the transaction. McClure was concerned that Payne might have talked to the police, and McClure resolved not to deliver the clothing for fear that the police might be waiting.

Payne was indicted for passing counterfeit obligations, in violation of 18 U.S.C. § 472. Neither Payne nor McClure testified at trial, but their statements were introduced via Hall's in-court testimony. Payne objected to the statements as hearsay, but the district court ruled that, as

coconspirator statements, they were admissible non-hearsay. Payne also objected to a limitation on the scope of his recross-examination of Hall: the district court forbade questions regarding the type of phone McClure used to call Payne, ruling that the topic had already been explored during cross-examination and redirect examination. A jury convicted Payne, and he was sentenced to one month in prison and three years of supervised release. Payne now appeals.

## II. ANALYSIS

### A. Hearsay

Subject to certain exceptions, hearsay is inadmissible. FED. R. EVID. 802. We begin by noting that if the out-of-court statements introduced at Payne's trial had not been offered to prove the truth of the matter asserted, there would be no hearsay problem. FED. R. EVID. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). But the government does not make this argument, and it in fact conceded at oral argument that the statements *were* offered to prove the truth of the matter asserted. Thus, we proceed with the hearsay inquiry.

#### 1. Standard of Review

Payne argues that the district court erroneously admitted the out-of-court statements included in Hall's testimony. "'In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, and reviews for clear error the court's factual determinations that underpin its legal conclusions.'" *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005) (quoting *United States v. Reed*, 167 F.3d 984, 987 (6th Cir.), *cert. denied*, 528 U.S. 897 (1999)). "This standard is consistent with the Supreme Court's admonition in *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), that we review evidentiary decisions for an abuse of discretion, because it is an abuse of discretion to make errors of law or clear errors of factual determination." *Id.*; *see also United States v. Jones*, 107 F.3d 1147, 1153-54 (6th Cir.), *cert. denied*, 521 U.S. 1127 (1997).

#### 2. Merits

The Federal Rules of Evidence exclude from the definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). In order for a statement to qualify for this exclusion, "it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made 'in furtherance of the conspiracy.'" *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc). In making this determination, the district court "may examine the hearsay statements sought to be admitted." *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). Yet the statements alone are not enough; they must be corroborated by independent evidence. *United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir.), *cert. denied*, 513 U.S. 852 (1994). The offering party must prove by a preponderance of the evidence that a statement should be admitted under Rule 801(d)(2)(E). *Bourjaily*, 483 U.S. at 176.

##### a. Payne's Membership in the Conspiracy

Payne first argues that the government did not prove a critical element of the coconspirator-statement exclusion: his membership in the conspiracy.[1] The challenged statements themselves are evidence that Payne was part of the conspiracy. *Id.* at 181. According to Hall, McClure said that he had a "hookup" who worked as a cashier at Hudson's. Although the usual scheme involved

---

[1]Payne does *not* argue that no conspiracy existed at all.

receiving multiple articles of clothing for the price of one, McClure declared that "this time he was going to do something different, and that was with the counterfeit currency." Joint Appendix ("J.A.") at 127 (Trial Tr. at 312) (Hall Test.). When Hall expressed doubts about whether the counterfeit currency would be accepted, McClure "said this guy was going to let it go through." *Id.* at 128. Hall testified that after speaking on the telephone with Payne, McClure stated "[t]hat we can come out there now, and he was going to let it go through and everything was cool." *Id.* at 129. Hall also testified to McClure's report of his conversation with Payne at the store: McClure said "[t]hat everything was straight, you know, go ahead and get what you all are going to get." *Id.* at 135. McClure also indicated that he had selected clothing that he would give to Payne in return for accepting the counterfeit currency. Finally, Hall testified that after a telephone conversation with Payne after the transaction, McClure said that Payne had asked to obtain the clothing he had selected. All of these statements suggest that Payne and McClure conspired to pass counterfeit currency at Hudson's.

Of course, these statements must be corroborated by independent evidence. *Clark*, 18 F.3d at 1341-42. In *Bourjaily*, statements indicating that a "friend" would be at a certain time and place to purchase cocaine were corroborated when the defendant showed up at the given time and place, picked up the cocaine, and was found to have a large sum of money in his car. 483 U.S. at 180-81. In the instant case, McClure's statements were similarly corroborated by the events that transpired. Payne was in fact a salesperson at Hudson's who operated a cash register; McClure met and spoke with Payne when the group arrived at Hudson's; Payne permitted Hall and the others to get the clothing they wanted; and Payne accepted the counterfeit currency.

Payne's membership in the conspiracy is further supported by other evidence that goes beyond the scope of the statements. First, a Secret Service special agent testified that when large sums of counterfeit currency are passed, the recipient typically knows the passer and knows that the currency is counterfeit. Second, the currency was readily identifiable as counterfeit. A Secret Service special agent who has investigated approximately one hundred cases of counterfeit currency testified that the currency in this case was of poor quality. Two other Secret Service special agents testified that they could discern that the currency was counterfeit by sight and touch. Even two laypersons — Hall and Wells[2] — testified that they could tell the currency was counterfeit. Indeed, Hall believed that the currency's counterfeit nature was so obvious that he "thought that . . . nobody would ever take it." J.A. at 128 (Trial Tr. at 313) (Hall Test.). This evidence shows that a typical cashier would have recognized (and presumably declined) the counterfeit currency. Payne's acceptance of obviously counterfeit currency supports the inference that Payne was not a typical cashier, at least during this transaction.

Third, Payne acted strangely during the transaction. Myers testified that a salesperson working on commission (as Myers and Payne did) typically attempts to increase sales by building a relationship with the customer, which might take the form of learning about his "history" and "needs," accompanying him throughout the store in order to recommend items he might buy, complimenting his selections, requesting permission to put him on a client list, and giving him a business card. J.A. at 191-94 (Trial Tr. at 430-33) (Myers Test.). Myers praised Payne's salesmanship, *id.* at 191 ("quite a competent salesm[a]n"), 197 ("a pretty stiff competitor"), 198 ("quite a quality salesman"), suggesting that Payne knew of and used these methods. Indeed, Myers had seen Payne employ some of them in the past. On this occasion, however, Payne did not use any of these sales tactics. *Id.* at 192 ("there didn't appear to be any significant interaction between Mr. Payne and the individuals"; "I didn't observe Mr. Payne suggestively selling or trying to build or

---

[2]Although Wells was the asset-protection manager at Hudson's, she had not been trained to identify counterfeit currency, nor had she previously investigated counterfeit currency or even been made aware of its presence during her tenure at Hudson's.

grow a sale"; "I don't think I saw Mr. Payne leave our area [to walk with the customers]"), 194-95 (testifying that Payne did not give the customers his business card or request permission to add them to his client list). Another unusual aspect of Payne's behavior was his lack of excitement about the magnitude of the sale. *Id.* at 196 ("[Y]ou generally gloat a little bit on a sale like that. That's a pretty good little piece of money for you."). Payne's unusual behavior supports the inference that this was no ordinary sale.[3]

Thus, the evidence shows that McClure and Payne discussed "buying" clothes at Hudson's with counterfeit currency before, during, and after the transaction; Payne accepted counterfeit currency even though it was readily identifiable as such; Payne's behavior during the transaction was unusual when compared to both a typical salesperson's tactics and his own past salesmanship; and large sums of counterfeit currency are commonly passed to a person (i.e., Payne) who both knows the passer (i.e., McClure) and knows that the currency is counterfeit. Payne's membership in the conspiracy was proved by a preponderance of the evidence.

### b. In Furtherance of the Conspiracy

Payne's second hearsay argument is more narrowly directed at a subset of statements: McClure's statements telling Hall about Payne's request for delivery of his (Payne's) clothing. According to Payne, these statements were not made in furtherance of the conspiracy and therefore should not have been admitted as coconspirator statements.

Statements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E).[4] *United States v. Franklin*, 415 F.3d 537, 552 (6th Cir. 2005); *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000); *United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997), *cert. denied*, 525 U.S. 823 (1998). McClure told Hall about Payne's request for his clothing in the context of revealing McClure's own concerns that Payne had spoken to the police. McClure told Hall that McClure did not intend to meet Payne for fear that the police would be there. Because McClure's statements were part of a discussion regarding concealment of an ongoing conspiracy, they were made in furtherance of the conspiracy.

Yet this conclusion does not end our inquiry, because embedded in McClure's statements was another out-of-court statement: Payne's request for his clothing. In order to admit an out-of-court statement that is nested within another, Rule 805 requires that *both* statements be admissible. *E.g.*, *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005); *United States v. Demjanjuk*, 367 F.3d 623, 631 (6th Cir.), *cert. denied*, 543 U.S. 970 (2004); *United States v. Maliszewski*, 161 F.3d 992, 1008-09 (6th Cir. 1998), *cert. denied*, 525 U.S. 1183 & 1184 (1999). We need not decide whether Payne's statement qualified for the coconspirator exclusion of Rule 801(d)(2)(E), however,

---

[3] Payne objects to the significance of Myers's observations because Myers testified that he also would have made the sale despite the customers' unusual behavior. The logic of Payne's argument appears to be that because a salesperson who was not part of the conspiracy (Myers) would have made the sale, one cannot infer from the fact that the sale took place that Payne was part of the conspiracy. This argument misses the mark for two reasons. First, the relevant aspect of Myers's testimony is not that Payne made the sale despite the customers' strange behavior but that Payne himself acted unusually. Second, Myers did not see the currency, so his "admission" that he would have made the sale tells us nothing about whether he would have done so even after seeing currency that was readily identifiable as counterfeit.

[4] It is crucial that the conspiracy be ongoing, as "statements regarding concealment that are made after the objects of the conspiracy have been completed are not made in furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005) (citing *Krulewitch v. United States*, 336 U.S. 440 (1949)). Here, the conspiracy was alive because the statements concerned payment, an "integral" part of a conspiracy. *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117 (1983); *see also United States v. Emuegbunam*, 268 F.3d 377, 396 (6th Cir. 2001), *cert. denied*, 535 U.S. 977 (2002); *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988), *cert. denied*, 488 U.S. 1031 (1989).

because in any event Payne's statement was admissible under Rule 801(d)(2)(A) as a party-opponent's own admission. *Gibson*, 409 F.3d at 337; *United States v. Davis*, 170 F.3d 617, 626-27 (6th Cir.), *cert. denied*, 528 U.S. 861 (1999); *Maliszewski*, 161 F.3d at 1007-08.

In sum, the out-of-court statements contained in Hall's testimony were admissible at trial because each qualified for an exclusion from the hearsay definition under either Rule 801(d)(2)(E) or Rule 801(d)(2)(A).

## B. Recross-Examination

### 1. Standard of Review

Payne next argues that the district court erroneously limited the scope of his recross-examination of Hall, in violation of the Confrontation Clause. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). "An essential component of the confrontation clause is the accused's right to cross-examine the state's witnesses."[5] *Miskel v. Karnes*, 397 F.3d 446, 452 (6th Cir. 2005) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). "However, the right to cross-examine is not absolute." *United States v. Beverly*, 369 F.3d 516, 535 (6th Cir.), *cert. denied*, 543 U.S. 910 (2004). "[A] trial court retains discretion to limit the scope of cross-examination, based on concerns such as 'harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *Mason v. Mitchell*, 320 F.3d 604, 633 (6th Cir. 2003) (second alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Accordingly, we review restrictions on cross-examination for an abuse of discretion. *United States v. Hines*, 398 F.3d 713, 716 (6th Cir. 2005); *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002). We apply the same abuse of discretion standard when reviewing limits on recross-examination. *United States v. Odom*, 13 F.3d 949, 957 (6th Cir.), *cert. denied*, 511 U.S. 1094 and 513 U.S. 836 (1994).

---

[5]We once said rather bluntly that the "denial of counsel's request to recross examine one of the prosecution's witnesses" is only "an evidentiary question [that] does not rise to a constitutional level." *Kinser v. Cooper*, 413 F.2d 730, 733 (6th Cir. 1969). Yet this court and others have suggested that foreclosing recross-examination *after the government elicits one or more new issues on redirect* would constitute a Sixth Amendment violation. *United States v. Dandy*, 998 F.2d 1344, 1350 (6th Cir. 1993) (rejecting a Sixth Amendment claim because the district court simply limited questions that went beyond the scope of direct and redirect examination), *cert. denied*, 510 U.S. 1163 (1994); *United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991) ("When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination on those new matters."); *United States v. Caudle*, 606 F.2d 451, 458 (4th Cir. 1979) ("To deny recross examination on matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter."); *United States v. Morris*, 485 F.2d 1385, 1387 (5th Cir. 1973) (noting that although there is no absolute constitutional right to recross-examination, denial of recross-examination "rise[s] to the level of harmful error" if new matters are raised on redirect). We do not read these cases to be at odds with *Kinser*, which did not specify whether a new matter had been raised on redirect.

Moreover, reading *Kinser* so broadly that it permits denying recross-examination of newly raised issues would be inconsistent with the purpose of the Confrontation Clause. "[T]he Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). Of course, the reliability of new matters drawn out during redirect examination is as important as the reliability of new issues raised on direct examination. Thus, when new matters are elicited on redirect, the Clause requires "testing in the crucible of [re]cross-examination."

## 2. Merits

We have permitted district courts to curtail or even to deny recross-examination if the government elicits no new matters on redirect examination. *Odom*, 13 F.3d at 957; *United States v. Dandy*, 998 F.2d 1344, 1350 (6th Cir. 1993), *cert. denied*, 510 U.S. 1163 (1994). In the instant case, the relevant issue is what Hall told law-enforcement agents about McClure's use of a Nextel phone to contact Payne. This topic was first elicited during Payne's cross-examination of Hall:

Q.   Did you say anything about a Nextel phone to the agents?
A.   I said that Fred [McClure] had a Nextel phone. That's what he called his friend on.
Q.   Who did he call?
A.   The guy at Hudson's that was his hookup, his partner, his Fred's [sic] buddy, whatever. They called each other.
Q.   On a Nextel phone?
A.   Fred had a Nextel phone.
Q.   Did he use a Nextel phone?
A.   Yes. He used a Nextel phone.
Q.   Tell me what a two-way mode is on a Nextel phone?
A.   I don't own a Nextel phone so I don't know.
Q.   Sir, didn't you indicate that Fred had used the phone to do a two-way mode phone on a Nextel phone?
A.   He used it where he could talk to him where I could hear it.
Q.   Did you tell the agents that Fred used a Nextel phone to contact a Hudson's cashier, Leonard Payne, who Fred referred to as his hookup using the Nextel two-way mode?
A.   Yes, I did tell them that.

J.A. at 174-75 (Trial Tr. at 403-04) (Hall Test.). On redirect, the government questioned Hall on this issue:

Q.   Now, [Payne's counsel] just talked to you about the Nextel two-way mode phone. Did you observe Fred with a Nextel phone?
A.   Yes, I did.
Q.   Okay. Did you — and I think you testified to this earlier, and correct me if I'm wrong. Did you observe him talking on it as you traveled to the Hudson's store on April 22nd?
A.   Yes, I did.
Q.   Okay. And did he tell you who he was talking to?
A.   Told me who he was talking to, yes.
Q.   Who was that?
A.   The guy he was going to see who worked at the Hudson's.
Q.   Okay. And did you overhear any of the conversation?
A.   Both of them, I did, when he talked to him. I could hear him. I don't know if he had him on intercom. I don't know if he had him on the two-way mode. I'm not for sure. I don't know how to work a Nextel. I don't own one.
Q.   Okay. But you told the agents that, in your statement, you told the agents that you believed it was a Nextel two-way mode?
A.   Yes.

*Id.* at 181-82.

Payne asked for an opportunity to recross-examine Hall, arguing that the government "brought up some new topics about the Nextel phone." *Id.* at 184. The district court denied Payne's request, ruling that the topic had already been explored during cross-examination and redirect.[6] Payne argues that the district court erred because the government did in fact elicit a new issue on redirect. To support this contention, Payne notes that after Hall testified on cross-examination that he had told the agents that McClure had a Nextel phone, he testified on redirect that he had told the agents that he *believed* McClure had a Nextel phone. In other words, according to Payne, Hall expressed more doubt on redirect than on cross-examination.

Examination of the transcript reveals, however, that this supposed change in testimony is illusory. Hall never actually used the word "believe" in his testimony on redirect; he simply answered "yes" to a government question using that word. *Id.* at 181-82 ("Q. Okay. But you told the agents that, in your statement, you told the agents that you *believed* it was a Nextel two-way mode? A. Yes." (emphasis added)). Hall's supposed change was instead simply a function of the slightly different phrasings employed by Payne and the government. *Compare id.* at 174-75 (Cross-Examination: "Q. Did you say anything about a Nextel phone to the agents?"; "Q. Did you tell the agents that Fred used a Nextel phone to contact a Hudson's cashier, Leonard Payne, who Fred referred to as his hookup using the Nextel two-way mode?"), *with id.* at 181-82 (Redirect: "Q. Okay. But you told the agents that, in your statement, you told the agents that you believed it was a Nextel two-way mode?"). One would hardly expect a witness — especially a non-lawyer — to notice the difference between these two questions, let alone intend to convey a different meaning simply by responding, "Yes."

The conclusion that there was no real change in the testimony about what Hall *told the agents* is further supported by the testimony regarding what Hall *saw*. On both cross-examination and redirect, Hall testified without hesitation or qualification that McClure had a Nextel phone. *Compare id.* at 174-75 (Cross-Examination: "Q. Did he use a Nextel phone? A. Yes. He used a Nextel phone."), *with id.* at 181 (Redirect: "Q. . . . Did you observe Fred with a Nextel phone? A. Yes, I did.").

Finally, Payne's reliance on two out-of-circuit precedents does not change the result. In each case, the district court denied the opportunity for recross-examination even though new information had been elicited on redirect. *See United States v. Riggi*, 951 F.2d 1368, 1375-76 (3d Cir. 1991); *United States v. Caudle*, 606 F.2d 451, 458-59 (4th Cir. 1979). In contrast, and for the reasons explained above, no new information was raised on redirect in the instant case.

Because the government elicited no new information on redirect, the district court did not abuse its discretion by limiting the scope of Payne's recross-examination of Hall.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** Payne's conviction.

---

[6] The court did, however, permit Payne to ask two more questions about Hall's plea agreement with the government.