NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0722n.06
Filed: November 21, 2008

**Nos. 07-5543 and 07-5544**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA (07-5543), | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIE GUILLERMO ESTRADA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNITED STATES OF AMERICA (07-5544), | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDEL VILLASENOR, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GIBBONS and COOK, Circuit Judges; and STEEH, District Judge.[*]

COOK, Circuit Judge. A federal grand jury indicted Willie Estrada ("Willie") and Fidel

Villasenor ("Fidel") for conspiracy to possess with intent to distribute marijuana (Count 2) in

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), and 846. The same indictment charged Fidel

_____

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District
of Michigan, sitting by designation.

with conspiracy to possess with intent to distribute methamphetamine (Count 1) in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846. Willie and Fidel both challenge their jury convictions, and Willie also appeals his sentence.

I.

This case involves an alleged drug ring that facilitated transactions between Texas and Kentucky. While investigating possible narcotics trafficking in early 2005, the Drug Enforcement Administration ("DEA") wiretapped the phone of John Little, a Kentucky resident, for nearly three months. Some 300 calls later, on April 11, 2005, DEA agents executed a federal search warrant at Little's home. Following the search, Little admitted to drug trafficking and agreed to cooperate with the Government for a reduced sentence.

Little's cooperation proved crucial to the Government's case. He testified that his relationship with Willie spanned several years, and that Willie acted as his marijuana supplier. Likewise, Little described Fidel as an "old-time" friend who agreed to sell him two to three pounds of methamphetamine and 100 pounds of marijuana in January 2005. Recorded calls reveal that in the succeeding weeks, Little contacted both Fidel and Fidel's brother, Arnold, about the January 2005 transaction. Although Fidel never completed the deal, his nephew, Jose Martin Perez (a.k.a. "Fatso"), delivered methamphetamine to Little around April 8, 2005, days before the DEA searched Little's home.

After a week-long trial, both Fidel and Willie moved for a judgment of acquittal based on insufficiency of the evidence, which the court denied.  On January 24, 2007, the jury returned guilty verdicts, finding beyond a reasonable doubt that Fidel conspired to possess with intent to distribute 500 grams or more of methamphetamine (Count 1) and less than 100 kilograms of marijuana (Count 2), and that Willie conspired to possess with intent to distribute between 100 and 1000 kilograms of marijuana (Count 2).  The court sentenced Fidel to concurrent terms of 144 months on each count and sentenced Willie to 97 months.  Both defendants timely appealed.

II.

A.  Fidel's Conviction

Fidel's sole challenge to his conviction is that the district court clearly erred in admitting Arnold's wire-intercepted statements ("Call 250") under the coconspirator hearsay exception.  Fed. R. Evid. 801(d)(2)(E).  A court properly admits statements under Rule 801(d)(2)(E) where the offering party demonstrates by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and declarant were coconspirators; and (3) the statements were made during the course of and in furtherance of the conspiracy.  *United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007) (citation omitted); *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006).  In making its findings of fact, a court may consider the statements themselves, *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), but the offering party must provide other independent evidence, *Payne*, 437 F.3d at 544.  At the close of evidence, the district court overruled Fidel's objection to the statements, making each

of the required findings. Although Fidel concedes that a conspiracy existed, he denies that he and

Arnold were coconspirators, and that Arnold's statements were made during the course of and in

furtherance of the conspiracy. We conclude that the court did not clearly err in admitting Arnold's

statements. *See Payne*, 437 F.3d at 544 (applying a clear-error standard of review for factual

determinations) (citation omitted).

### 1. Both Fidel and Arnold Were Coconspirators

Fidel argues that the Government failed to demonstrate either his own or Arnold's

involvement in the conspiracy. Specifically, Fidel construes Call 250 as Little merely complaining

about Fidel and notes that Little's colleagues did not mention either Fidel or Arnold in their

testimonies. These arguments are meritless.

First, the Government introduced several wire-intercepted calls between Little and Fidel that

point to Fidel's role as a coconspirator. DEA Agent Samantha McIsaac testified that after Fidel and

Little met in January 2005 to negotiate a marijuana and methamphetamine purchase, the Government

intercepted thirty-one calls between the two men during the next three months, five of which the

Government introduced into evidence. Each call pertained to a delay in the transport of the drugs

and involved drug-related euphemisms that Little decoded at trial. For example, on March 20, 2005,

Fidel told Little: "I can't send nobody, it's got to be me that meets you down there . . . . [But] I can't

leave this place until I get all the, all of the parts, for that Camaro ready." Little testified that Fidel

used "Camaro" as a euphemism for marijuana. On March 26, 2005, Fidel reiterated that he could

not find a courier: "My ride is on vacation right? And he don't want to leave because of his family and his kids, and because it's a holiday, well, what can I do?" The final call between the two, on March 29, 2005—three days before Little's contested conversation with Arnold—reflected Little's increasing agitation about the delayed transaction. These various phone calls provide ample support for Fidel's involvement in the drug conspiracy.

Second, the statements Arnold made during Call 250 suggest that Arnold, too, acted as a coconspirator. Although Little concedes that he called Arnold to complain about the delay, he also explained that he called "to get the truth" about why the transaction had stalled "for two or three weeks." In the course of the call, Arnold spoke knowledgeably about the impending deal:

| | |
|---|---|
| LITTLE: | Okay, you know, I'd like to get this to work, you know what I'm talking about . . . |
| ARNOLD: | Yeah. |
| LITTLE: | But I been setting [sic] here 2 weeks . . . You know what I'm saying . . . it's not you, but I mean, you guys are still working together . . . |
| ARNOLD: | Yeah, but he [inaudible] John, I know we been trying to get it going, but the problem is the transportation John . . . . We got 113 of those things, and . . . |
| LITTLE: | And you got 'em, you got 'em? |
| ARNOLD: | And we ain't got no money to give the driver man and he's not taking off, so . . . it might go today or tomorrow, but at the latest, we're working on sending you only, uh, what you [inaudible] 100 . . . it's going to be a dollar and three. |

Arnold's knowledge of the transaction is probative of his involvement with Fidel in the conspiracy. In fact, he used the term "we" six times while discussing the deal. Later, after Little rejected

- 5 -

Arnold's attempt to pass the phone to another individual participating in the transaction ("Frank"), Arnold again referenced his role as a coconspirator: "Well, he's the one you're getting it from, so you may was [sic] well . . . he's the one *I* have to go through." (emphasis added). Finally, after mentioning Perez (or "Fatso"), the brothers' nephew, as an alternate source of narcotics, Little corroborated Arnold's involvement in the conspiracy by saying, "I'd rather work with you [and] your brother instead of Fatso."

Third, the fact that Little later purchased methamphetamine from Perez independently supports Arnold's role as a coconspirator. Arnold acknowledged that Perez supplied drugs, and the Supreme Court notes that where a declarant's statements corroborate events that later transpire, those later events provide independent evidence that the declarant and defendant were coconspirators. *See Bourjaily*, 483 U.S. at 180–81 (concluding that independent evidence corroborated that the defendant and declarant were coconspirators where "[t]he friend, who turned out to be [the defendant], showed up at the prearranged spot at the prearranged time . . . [,] picked up the cocaine, and a significant sum of money was found in his car."); *Payne*, 437 F.3d at 545.

Fourth, although Fidel contends that neither Fidel nor Arnold are coconspirators because David Frederick and Kevin Shrull—two coconspirators who testified at trial—did not mention the brothers, his argument carries no weight. This court maintains that one coconspirator need not know every other coconspirator or the scope of the enterprise in order to be a participant in the conspiracy. *See United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998). And Little testified that

Arnold recommended coconspirator Willie as a supplier for marijuana, which Fidel seems to concede in his brief. In sum, the Government presented sufficient evidence for this panel to conclude that the district court did not clearly err in finding that both Fidel and Arnold were coconspirators for purposes of Rule 801(d)(2)(E).

2. Statements Made During the Course of and in Furtherance of the Conspiracy

Fidel next argues that the Government failed to demonstrate that Arnold's statements were made during the course of and in furtherance of the conspiracy. This court considers a statement "in furtherance" of a conspiracy if it is "intended to promote the objectives of the conspiracy." *Conrad*, 507 F.3d at 430 (internal quotation marks and citation omitted). Under that analysis, we reject Fidel's argument.

The timing and the context of the statements are key. *See Conrad*, 507 F.3d at 430 (holding that the district court erred by not determining when a statement occurred or in what context). Call 250 occurred on April 1, 2005, following five phone calls between Little and Fidel during March 2005, each of which revealed Little's frustration with the delayed drug transaction. The timing and context thus suggest that Call 250 represents an attempt to finalize details relevant to the deal.

We are likewise persuaded by the fact that Arnold's statements "identif[ied] participants and their roles in the conspiracy." *See United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997) (quoting *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994)). Arnold identified Perez as an

alternate source of drugs, named another individual ("Frank") as the supplier, and knew that the transportation of the drugs presented a problem for completing the transaction. In fact, Arnold suggested a timeline for the deal, hypothesizing that "[the drugs] might go today or tomorrow."

Arnold also furthered the conspiracy by employing coded language to aid the drug ring's objectives. *See Payne*, 437 F.3d at 546 ("Statements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)."). He referred to "dollars" when discussing the transaction with Little: "[W]e're working on sending you only, uh, what you [inaudible] 100 . . . it's going to be a dollar and three." And Little later testified that these dollar amounts corresponded to pounds of marijuana (i.e. "a dollar" equals 100 pounds).

Under our deferential review of the district court's factual findings, we conclude that the district court did not clearly err in applying Rule 801(d)(2)(E) to admit Arnold's statements at trial.

B. Willie's Motion for Mistrial

Willie also argues that the district court abused its discretion in denying his motion for mistrial because: (1) Little mentioned Willie's prior convictions; (2) the court admitted irrelevant photographs of both Mike and Desi Sr. Estrada; (3) the court implicitly allowed Little to speak to Agent McIsaac during a trial break; and (4) the court admitted wire-intercepted statements of Desi Jr. Estrada under Rule 801(d)(2)(E). *See United States v. Childs*, 539 F.3d 552, 562 (6th Cir. 2008) (applying an abuse-of-discretion standard). We reject each of these arguments, treating them in turn.

### 1. Willie's Prior Convictions

During his testimony, Little mentioned that Willie "had previous convictions." When Willie objected and moved for new trial, the district court instructed the jury to disregard the statement but denied Willie's motion.

This is not, as Willie claims, a futile attempt to "unring a bell." *United States v. Murray*, 784 F.2d 188, 189 (6th Cir. 1986). First, Little's comment about Willie's prior convictions did not elaborate on "the name [or] the nature" of the convictions, and the court immediately gave a curative instruction. *United States v. Stotts*, 176 F.3d 880, 887 (6th Cir. 1999); *see United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999) (affirming the denial of a motion for mistrial where "the district court gave an immediate and clear limiting instruction" after a reference to a prior arrest); *United States v. Terry*, 729 F.2d 1063, 1070 (6th Cir. 1984) (finding that statements made by a police officer and FBI agent about other criminal investigations were "not so prejudicial as to deny [the defendant's] right to a fair trial" where neither witness directly referenced the criminal activity). Second, the evidence against Willie dwarfs the statement's import. *See United States v. Moore*, 376 F.3d 570, 575 (6th Cir. 2004) ("The single comment, which the court immediately admonished the jury to 'completely disregard,' did not taint the case so as to deny [the defendant] a fair trial."); *Harris*, 165 F.3d at 1066 (noting that "the officer's stray remark constituted only a minuscule part of the evidence against [the defendant]"). By the time he made the statement, Little had already testified that Willie knew Fidel's nephew, Perez, and that Willie, together with his nephew Mike,

brought him a load of marijuana in September 2004. He also testified about several later drug deals with Willie. The district court did not abuse its discretion in denying the motion for mistrial despite Little's reference to Willie's previous convictions.

## 2. The Photographs

This court reviews the district court's decision to admit photographs of Mike and Desi Sr. for abuse of discretion, and even if the court abused its discretion, does not require a new trial unless the mistake affected the "substantial rights" of a party. *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002).

In order to be relevant for purposes of Rule 401, evidence must tend "to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401; *Cope*, 312 F.3d at 775. Willie argues that neither Mike nor Desi Sr. were members of the conspiracy and the admission of their pictures only "provoke[d] the notion that this was a criminal family enterprise" by "throw[ing] in another picture of another Hispanic with the same last name." For its part, the Government explains that because testimony at trial involved "four different co-conspirators with the last name Estrada," it admitted the photographs "so the jury could place a face with a name." But the Government cites no authority for its conclusory association of the photos' "illustrative purposes" with Rule 401 relevancy. Moreover, the photographs to which the Government points are only head shots that have little bearing on demonstrating involvement in a conspiracy.

Although the relevancy of the photos seems weak, their use did not affect the substantial rights of any party, so the court did not abuse its discretion in admitting them.

### 3. Little's Communication with Agent McIsaac

Willie also argues that the district court improperly denied his mistrial motion because Little and Agent McIsaac communicated during a trial break. When Willie objected to that issue during trial, however, the court specifically made findings as to the prejudicial effect of the discussion. When probed by the court, Little stated that he told McIsaac that Desi Jr. had wanted to trade marijuana for cars, and that he received Desi Jr.'s phone number from Mike. The court gleaned that McIsaac only acknowledged Little's statements without suggesting either content or method for testifying, and then overruled the motion. Raising the same issue on appeal, Willie fails to enunciate any reason why this communication prejudiced him, so we conclude that the court did not abuse its discretion in denying his motion for mistrial.

### 4. The Intercepted Statements

Willie next contends that the district court abused its discretion in denying his mistrial motion because the court improperly admitted intercepted statements between Desi Jr. and Little ("Call 171") under the coconspirator hearsay exception. Fed. R. Evid. 801(d)(2)(E); *see supra* Part II.A. According to Little's testimony, Call 171 took place on March 6, 2005, after police arrested Desi Sr. and Mike Estrada, and transpired in relevant part as follows:

DESI JR:     Yeah.  [Mike and Desi Sr.], uh . .. they've been picked up since you last spoke with them. Cause I know.  I spoke with him on Thursday and he told me that you were going to send me, uh, some *stuff* for the vehicle that I purchased.  Right?

LITTLE:     Yeah, you got that package all right?

DESI JR:     Yeah.

LITTLE:     And he said . . . all he told me was he was going to have to, uh, maybe run out of town for two weeks.  But, see . . . we had an agreement that when he has a package . . .

DESI JR:     . . . he calls you.

LITTLE:     Yeah.

DESI JR:     Yeah.  And that's the thing.  I didn't know how to get a hold of you.  So, I thought . . .

LITTLE:     I haven't talked to anybody. [Inaudible]

DESI JR:     Yeah.  Uh, if anybody approaches . . . If anybody approaches you, don't, don't . . . you don't know us . . . nothing.  You don't talk to anybody until we get a hold of you guys again.

. . .

DESI JR:     I know that I want to talk to you about some more cars that I, uh . . . That I want to buy from you cause I'd like to resell them.  So, uh . . .

LITTLE:     I would think they'd

DESI JR:     Uh, just because they said that he . . . He used that as part of the deal.  I told them that, that's false.  I told them that I sent my brother up there to pick up vehicles for me.  And they said that they caught him, I guess, driving down south and they gave him two warnings; like tickets, I guess.  So, in the process, they said that he used that to go up north.

The Government contends that these statements fall within the coconspirator hearsay exception because Desi Jr. is a coconspirator and the statements were made in furtherance of the conspiracy. *See Conrad*, 507 F.3d at 429.  To that end, the Government points out that Little testified that Desi

Jr. wanted to continue in the business of trading cars for marijuana, and that Desi Jr. made statements in furtherance of the conspiracy when he warned Little against talking to anyone or attempting any further drug transactions while the situation with DEA agents was "hot." The court accepted that the cars discussed were intended as part of an exchange for marijuana and that Desi Jr.'s warnings were given as a coconspirator in furtherance of the conspiracy, and admitted the statements.

The district court's finding that the statements were made during and in furtherance of a conspiracy likely survives clear-error review, but a closer question exists as to whether the court clearly erred in finding that Desi Jr. was a coconspirator. In order to demonstrate that a preponderance of the evidence supports such a finding, the Government must provide evidence independent from the statement in dispute. *Payne*, 437 F.3d at 544. Here, the Government points to a single instance where Desi Jr.'s relationship to the conspiracy was mentioned outside the contested Call 171. In its entirety, the discussion on direct examination proceeded as follows:

> GOV'T: And with reference to Desi, the vehicles, was it your understanding that he wanted to continue in the business?
>
> LITTLE: That's what he said.

The independent support offered by the Government is not wholly convincing, but is sufficient under our deferential standard of review. Given Little's testimony describing Desi Jr. as a coconspirator, the district court did not clearly err in admitting the statements under Rule 801(d)(2)(E), and thus denying the motion for mistrial fell within its sound discretion.

C.  Willie's Motion for Acquittal

Willie next asserts that the district court wrongly denied his motion for acquittal because there is insufficient evidence demonstrating that he specifically intended to join or that he joined the alleged conspiracy.  On de novo review, we reject his argument because the evidence, viewed in the light most favorable to the Government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.  *See United States v. McGee*, 529 F.3d 691, 696 (6th Cir. 2008).

The jury here found Willie guilty on Count 2 of the indictment, which alleged that between February 1, 2003, and April 11, 2005, Willie, along with several others (including Little, Fidel, and Perez), "knowingly conspired . . . to knowingly and intentionally possess with the intent to distribute and to distribute 1000 kilograms . . . of marijuana" in violation of 21 U.S.C. § 846.  Conspiracy under 21 U.S.C. § 846 requires that coconspirators entered an agreement to violate drug laws and that each coconspirator "knew of, intended to join, and participated in the conspiracy." *Conrad*, 507 F.3d at 432.  Willie claims that despite being a seller in a common buyer-seller relationship with Little, he never agreed to join the conspiracy, and no evidence suggests his specific intent to do so.

This court generally holds that a buyer-seller relationship alone is insufficient evidence of attachment to a conspiracy, but "additional evidence beyond the mere purchase or sale of drugs, such as evidence of repeat purchases or some enduring arrangement that implies knowledge of the scope of the conspiracy may support a conspiracy conviction." *United States v. Layne*, 192 F.3d 556, 568

- 14 -

(6th Cir. 1999). Here, ample evidence demonstrates that Willie agreed to and knew of the conspiracy.

First, Little testified that Frederick knew Willie and Mike Estrada, and that Willie and Mike would supply the marijuana, while Frederick and Shrull would return with the marijuana. Second, Little testified to arranging multiple purchases with Willie, which suggests that Willie understood the conspiratorial reach of the relationship. *See United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003) ("[E]vidence of repeat purchases provides evidence of more than a mere buyer-seller relationship."). In all, Little testified that Willie shipped him "maybe 265" pounds of marijuana (or approximately 120 kg), often by way of a courier named "Lolly;" *cf. United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004) ("Testimonial evidence from a co-conspirator may be sufficient to determine the amount of drugs for which a defendant should be held accountable, even where the co-conspirator has reason to believe that he may receive a reduced sentence as a result of his or her testimony."). The presentence report (the "PSR")—to which Willie did not object—held him responsible for the distribution of 386 pounds of marijuana (or approximately 175 kg). Regardless, 265–386 pounds (or 120–175 kg) of marijuana is an amount consistent with an inference of conspiring to distribute narcotics within a conspiracy. *See United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003) (suggesting 100 kg of marijuana to be consistent with distribution).

Documents introduced into evidence corroborate Little's testimony, including a drug ledger with Willie's name on it and a notebook of contacts in which Little had written: "Willie 956-453-

8240." Moreover, the phone number 956-453-8240 corresponds with a call allegedly between Willie and Little that occurred on February 14, 2005 ("Call 77"). During Call 77, Little mentions both Willie and Lolly by name, and the two discussed specific drug transactions:

WILLIE: [T]hese girls are pretty, I need, I need the best thing is I can get the shirts, John but the freight you see what I'm saying because I need to pay the thing.

LITTLE: I know what you're saying . . . .

WILLIE: In order to work over there I need at least 20 to 25 thou . . . you know 20.

LITTLE: Shuu . . . .

WILLIE: You know because I'm buying the shirts and I'm buying you know . . .

LITTLE: The freight, the freight is what kills you.

WILLIE: The freight is 10 easy, [inaudible] dollar

LITTLE: So, you're gonna send Lolly

WILLIE: . . . So I'm selling 100 shirts from here so that's 10

LITTLE: Yeah that will cost you

WILLIE: So you know what it cost to buy a 100 shirts

LITTLE: So you are going to send Lolly and Rick and you and the Blonde [or Stacy Garcia] are coming

WILLIE: Yes, and then the blonde going on you know but I'll be over there too.

LITTLE: Okay, I'll see you.

Little testified that he and Willie referred to marijuana as both "girls" or "shirts." Considering the wire-intercepted statements, various drug transactions, and Little's testimony, the record contains sufficient evidence to permit a rational trier of fact to believe that Willie knowingly and willingly joined the conspiracy. The district court properly denied Willie's motion for acquittal.

- 16 -

### D. Willie's Sentence

Finally, Willie challenges the reasonableness of his sentence. During the sentencing hearing, the district court noted that Willie's PSR assigned him an offense level of 26 and a criminal history category of III, resulting in a Guidelines range from 78 months to 97 months. Neither the Government nor Willie objected to the PSR, either in writing or at the hearing. Although mentioning that it had the opportunity to pursue a higher sentence for prior convictions under 21 U.S.C. § 851, the Government requested a sentence of 97 months. Pointing out that one of Willie's 1988 convictions involved his leadership in a conspiracy to distribute marijuana from Mexico, the Government reasoned that "any subsequent sentence . . . should be at minimum as much as what he received before, otherwise the deterrence and punishment and those ends would not be met." Willie's counsel disagreed and sought a 78-month sentence due to Willie's "limited" role in the conspiracy. During colloquy, the court concluded:

| | |
|---|---|
| THE COURT: | Well, I'm going to accept the report and the guideline application there, and I did sit through the trial. I know the facts of this case, and I know what the facts are in this report. What was it; 300 and some odd pounds that were— |
| GOVERNMENT: | Eighty-six your Honor. |
| THE COURT: | 386, which sounds reasonable and appropriate to me. You're not being saddled with 1,000 and some odd pounds like some of the others, so I think a guideline range of 78 to 97 is appropriate and reasonable, especially considering your prior history. And I do have to agree with Mr. Kinnicutt that I think if you recommit an offense after engaging in a similar conduct, your sentence ought to be more than it was before, and before you got 78 months; right? I think that's what it was, followed by a four-year term of supervised release. |

Observing that the PSR associated Willie with 386 pounds of marijuana, the court concluded that the Guidelines range was "appropriate and reasonable," and in light of Willie's prior history and the Government's argument that Willie ought to receive a higher sentence after the 1988 incident, the court assigned him to 97 months in prison.[1]

Willie contends that his sentence is procedurally unreasonable on two grounds: (1) the court failed to explain sufficiently under 18 U.S.C. § 3553(a) its decision to sentence him to the high end of the Guidelines range, rather than accounting for his "subsidiary role in the alleged conspiracy"; and (2) the court did not indicate that it applied the Guidelines as advisory. In assessing the reasonableness of a sentence, we review the district court's sentence for abuse of discretion. *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). In a two-part analysis, we ask first whether the court made procedural errors, including "treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, . . . or failing to adequately explain the chosen sentence." *Gall*, 128 S. Ct. at 597. Only after resolving procedural questions do we examine substantive reasonableness. *Id.* We hold that the district court did not abuse its discretion in sentencing Willie.

---

[1]The court did not ask whether either party had any objections after pronouncing Willie's sentence and before adjourning the sentencing hearing, as required under *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004). The court's failure to do so ensures that Willie did not forfeit any objection and is not required to prove plain error on appeal. *Id.*

First, the court sufficiently explained under 18 U.S.C. § 3553(a) its decision to sentence him to the high end (97 months) of the Guidelines range. As a foundational matter, a sentence like Willie's that falls within the Guidelines range is presumptively reasonable. *United States v. Rita*, 127 S. Ct. 2456, 2462 (2007); *United States v. Duane*, 533 F.3d 441, 453 (6th Cir. 2008). Willie fails to rebut this presumption. Although he argued at the hearing for a sentence at the low end of the Guidelines range due to a limited role in the conspiracy, the court adequately examined the § 3553(a) factors and explained more compelling reasons to assign the higher sentence.[2] The court analyzed the "nature and circumstances of the offense," § 3553(a)(1), and found that a Guidelines range of 78 to 97 months was "appropriate and reasonable" given responsibility for 386 pounds of marijuana. Likewise, the court reflected on the sentence's ability to "afford adequate deterrence," § 3553(a)(2), and after noting that the prior sentence was for 78 months, agreed with the Government's reasoning that recommitting a past offense ought to result in a higher sentence. Although the court did not respond directly to Willie's limited-role argument, the fact that Willie failed to object and seek a downward departure, and that the court discussed the relevant § 3553(a) factors, sufficiently explains the sentence. *See Duane*, 533 F.3d at 452 (not requiring a "ritualistic incantation" of each of the § 3553(a) factors) (quoting *United States v. Trejo-Martinez*, 481 F.3d 409, 413 (6th Cir. 2007)).

---

[2]Willie's argument is even less compelling because he failed to object to the probation officer's calculation of his offense level, which included finding no adjustment for having a minor role in the offense. U.S.S.G. § 3B1.2(b).

Second, although the court did not expressly describe the Guidelines as advisory, there is no indication that the court failed to treat them as such. As Willie himself notes, an explicit statement that the Guidelines are advisory is unnecessary. *See United States v. Bailey*, 488 F.3d 363, 367 (6th Cir. 2007) ("[W]e refuse [the defendant's] request to create an automatic-remand rule whenever the district court does not explicitly acknowledge that the Guidelines are advisory."). In *Bailey*, a panel of this court required the appellant to "marshal evidence in support of the position that the district court actually failed to apply the Guidelines as advisory" in order to succeed on this type of appeal. *Id.* Here, Willie merely summarily states that "there was no demonstration that the district court applied the Guidelines as advisory." Willie can point to no statement suggesting that the court treated the Guidelines as anything but advisory; finding no meaningful argument to the contrary, we affirm his sentence.

III.

We affirm the district court's judgment with respect to both Fidel and Willie.